Lister *v.* Lister.

---

EMMA K. LISTER, petitioner,

*v.*

ROBERT LISTER.

[Filed October 15th, 1903.]

1. Where a wife is justified in leaving her husband on account of his cruelty, the separation is legally chargeable to the husband, and constitutes a legal abandonment or desertion upon his part.

2. Where a wife leaves her husband, and seeks to establish constructive desertion by him on account of cruelty, her testimony must be corroborated.

3. After a separation caused by cruel conduct of a husband, it is his duty to reform his habits, and within two years seek out his wife and

apply to restore the marital relations, giving her reasonable assurance of the sincerity of his reformation and of her probable safety in resuming the marital relations.

4. If, at the time of offering to return to live with his wife, the husband was, in fact, living in adultery, or if he willingly permitted the wife to remain under the impression that he was guilty of adultery, the offer to return cannot be considered as one made in good faith, or to be an offer which the wife was bound to accept for the purpose of terminating the desertion.

On petition, answer and cross-bill, replication and proofs.

*Mr. Elvin W. Crane,* for the petitioner.

*Mr. Samuel Kalisch,* for the defendant.

EMERY, V. C.

In this case there are cross-petitions by wife and husband, each charging desertion by the other. The actual separation of the parties took place about October 15th, 1899, when the wife left the hotel, in Newark, where the husband, herself and the children had been boarding since January, 1899. She left the husband and took the children with her, and her claim is that she was obliged to do this on account of her husabnd's cruelty. Where a wife is justified in leaving her husband on account of his cruelty, the separation is legally chargeable to the husband, and constitutes a legal abandonment or desertion upon his part. This is the settled rule in this state. *Weigand* v. *Weigand, 14 Stew. Eq. 202, 209 (Vice-Chancellor Van Fleet, 1886)*; *affirmed on appeal,* for the reasons stated below, *15 Stew. Eq. 699;* subsequently approved in *Dummer* v. *Dummer, 41 Atl. Rep. 149, 150 (Errors and Appeals, 1898)*; *McVickar* v. *Mc-Vickar, 1 Dick. Ch. Rep. 490 (Vice-Chancellor Pitney, 1890)*. The husband alleges that the separation was without justification, and was a desertion by the wife, which has been continued obstinately and against his efforts to terminate it. The questions involved are altogether questions of fact, and the first one is whether the petitioner has satisfactorily established that the cruelty of her husband was such as to justify her separation

Lister *v.* Lister.

from him, as necessary for the protection of her life or health. If her own evidence is true, she has certainly established a case of extreme cruelty, but as the case is one of constructive desertion, her evidence alone is not sufficient, and it must be satisfactorily corroborated; and the real question, therefore, on this branch of the case, is whether she has produced such corroborative evidence. In my judgment she has. The defendant's vindictive feelings toward his wife and his abusive language to and about her, while under the influence of liquor, is established by the evidence of the proprietor of the hotel and his wife and employes of the hotel, and by ·the evidence of former servants of the parties; and the evidence also shows that, when defendant was in this condition, his wife, in one instance at least, felt obliged to leave the family rooms, with the children, and stay elsewhere in the hotel for safety. This condition of intoxication and his abuse of his wife occurred from time to time after 1894, and while living at the hotel the proprietor felt called on to remonstrate with him about his conduct and treatment of his wife. Once before the petitioner left defendant on account of his cruelty, as she says, going, in this instance, to the defendant's mother's, but she returned within a day or two, upon his promise to reform. The act of cruelty which led·to the final separation, on Sunday, October 15th, 1899, was her husband's choking her while in bed, abusing her and threatening to kill her. The wife is the only witness to this occurrence, and the husband denies that he either struck, choked or threatened her. Two witnesses, however, swear that, on that day, they saw on the wife's neck marks or bruises, and one of them—the bellboy—says that, in her husband's presence, the petitioner said defendant had done this. The other witness saw the marks on the neck and arm on the same day in New York, where petitioner had brought her children to stay. The husband, as to striking his wife, then or at any other time, says:

"She would get in some dispute—she was just as apt, and more apt many a time, to have the dispute out as I would, and she would come up and make a strike at me as quick as she would look for one from· anybody else, and if I would shove her, 'Now, you have hit me—you have struck me—I have got a black and blue mark,' the first thing every time after her helping every quarrel on."

And again, in reference to ever striking her at the hotel, says:

."I pushed her away from me when she has come up that way—pushed her away from me; she has been looking—she was always, up to the Continental Hotel, looking for me to make black and blue marks on her, and I notice she could show up black and blue marks if I looked at her—manipulate herself."

Notwithstanding the husband's denial of striking his wife, on his direct answer to the questions, I am inclined to think that the above evidence, taken in connection with the evident lack of self-control and his disposition toward his wife, shown by his evidence and bearing on the stand, is also corroborative of the wife's evidence as to his treatment of her.  His claim that the "black and blue marks are due to manipulation" would seem to amount to an admission that the marks were there, and, if so, the only question is, is there any sufficient reason to support the conclusion that they were self-inflicted.   Upon the entire evidence in the case, my conclusion is that the wife has satisfactorily made out a case of cruelty on the part of the defendant, justifying her in separating from him, and that the separation is therefore legally chargeable to the husband.   As to the duty of the husband, after a separation thus occasioned by his conduct, the rule applied is that it is the duty of the husband to reform his habits, and after such reformation, and within two years, seek out his wife and apply to restore the marital relations, giving her reasonable assurances of the sincerity of his reformation and of her probable safety in resuming marital relations. *McVickar* v. *McVickar, 1 Dick. Ch. Rep. 490, 501 (Vice-Chancellor Pitney, 1890).* This is a special application of the general rule settled by our decisions that, where the husband has, by his conduct toward his wife, contributed to the desertion, he must make such advances and concessions as a just man would make, and might reasonably be expected to make, in order to induce her to return. *Cornish* v. *Cornish, 8 C. E. Gr. 208 (Chancellor Zabriskie, 1872)*; *Hall* v. *Hall, 15 Dick. Ch. Rep. 469, 470 (Errors and Appeals, 1900).*  What the assurances should be depends upon the circumstances of each case. The husband did in this case apply to his wife to return to him,

but his wife was unwilling to return, because she did not trust him or believe he was living a proper life. She thought he was still continuing his habits of drinking, and also that he had been living unfaithfully after the separation. If, at the time of offering to return to live with his wife, the husband was, in fact, living in adultery, the offer to return cannot be considered as one made in good faith, or to be an offer which the wife was bound to accept, for the purpose of terminating the desertion. In *Mallinson* v. *Mallinson, L. R. 1 Pr. & Div. 93 (1866)*, Lord Penzeance, judge-ordinary, says, upon this point, that the mode of life of the respondent, at the time the alleged offer to return is made, is material, as showing whether or not the offer was sincere. Shortly after their separation, and in February, 1900, the petitioner, under the advice and arrangement of counsel, employed detectives to watch her husband's movements, and the detectives reported to her counsel that the husband had been followed by them to a hotel in New York, and had been seen to go into a room with a woman, in whose company he had previously dined at the hotel. Defendant and his counsel, Mr. Frank M. McDermit, had both seen petitioner's detective immediately after this occurrence, and defendant then had a conversation with the detective. Within two or three days defendant's counsel, Mr. McDermit, with defendant's consent, entered into negotiations with petitioner's chief detective, and, in defendant's presence, offered the detective money not to report what had been seen. The present explanation of defendant and his counsel is that this woman whom defendant met was herself a detective, and that she was there, in company with other detectives, and met defendant by arrangement, for the purpose of leading petitioner's detectives into a trap, and ascertaining whether petitioner was employing detectives to watch her husband, she having denied that she was employing them. Mr. McDermit, who was sworn in this case, admits that an offer of money ($3,000) was made, in defendant's presence, to the petitioner's detective to suppress his report to petitioner's counsel, but he now swears that this was a ruse, for the purpose of ascertaining whether the detective really had the petitioner's note for $2,000, as he

8

claimed.   The remarkable feature about this explanation, and
the bearing which the explanation has upon the present inquiry,
is that, until this explanation was given under oath on this hear-
ing, it does not appear that the husband or his counsel ever
made any effort to disabuse the mind of his wife or of her coun-
sel of the correctness of the impression given them by their
detective that defendant had been seen with a woman, under
suspicious circumstances, in New York by the detectives, and
that defendant had offered money to suppress the report.   And
not only this, but defendant seems to have allowed his wife to
pay, or to have been willing that she should pay, the detective
she had employed a large sum of money ($1,000) for informa-
tion which, as he now claims, gave her a wrong view of his
conduct.   After receiving this information from the detective
the petitioner, as she swears, spoke to her husband about it, and
told him "he had been caught with a woman," to which his
reply was, "What are you going to do about it?"   The husband
did not, at any time previous to this hearing, correct, or attempt
to correct, in any way, the impression received by his wife from
the reports of the detectives as to the occurrence at the hotel
in New York.   Mrs. Lister says that, before this conversation,
when he asked her to come back and she refused, he had said
to her that if she wouldn't come back, she had better sue for
an absolute divorce.

Upon the evidence offered by defendant it is difficult to resist
the conclusion that the defendant, in this incident of the hotel,
intentionally supplied to petitioner's detectives, who seem to have
been acting in entire good faith, evidence that would, to some
degree, tend to support a charge of adultery, and that he
made no effort to correct the effect of this evidence.   A re-
quest to return, made by the husband to the wife while she was
allowed to remain under this impression as to his conduct, can-
not be considered as a *bona fide* offer, or as one which changed
the character of the separation.   The defendant also seems to
have been willing to allow his wife's state of mind as to his
unfaithfulness to her in other instances to continue after the
separation.   For six months, and up to within four or five
weeks of the hearing, he has made, as he says, his headquarters

Lister *v.* Lister.

in New York, in a flat or apartment in Eighty-third street, where a woman lives with her two daughters. He goes there, when he is in New York, spends two or three days, either alone or with a friend, and pays board—a fair amount ($4 or $5 a week)—and defendant goes out with these women. Petitioner was informed by her counsel that defendant was at this place, and when he spoke to his wife, in the summer of 1900, about coming back to live with her, she said to him, "I don't see how you can ask me to do that when you have got this woman in New York." Defendant had previously denied having a woman there, but on this occasion he said, "Well, she is a Jewess, but she has a white heart." The husband denies any improper relations with these women, but does not deny this conversation, and, if it occurred, the husband was not unwilling that the wife's impression as to his unfaithfulness should continue. She was not bound, in my judgment, to consider this request to return as made in good faith.

Whether the husband's habits as to drinking have been reformed has not been shown, and, under all the evidence in the case, I reach the conclusion that the husband has not shown in this case any such change in his habits, or such a mode of living after the separation, as was calculated to give to his wife the reasonable assurance of his reformation, and of her probable safety in resuming marital relations, to which she was entitled. The continuance of the separation, therefore, must be held to be due to his continued, wilful and obstinate conduct, and the wife is entitled to a divorce for desertion. The cross-bill of the husband will be dismissed.